IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KIANOOSH JAFARI,<br><br>Defendant. | Case No. 1:22-cr-197-RDA<br><br>The Hon. Rossie D. Alston, Jr.<br><br>Hearing: April 12, 2023 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, through its undersigned counsel, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("Guidelines" or "U.S.S.G."), hereby submits its position with respect to sentencing of Kianoosh Jafari ("the defendant" or "Jafari"). For the reasons set forth below, the United States respectfully submits that a term of imprisonment within the parties' stipulated guideline range would be reasonable and appropriate under 18 U.S.C. § 3553(a).

## I. BACKGROUND

This scheme came to light after many members of the Darakhshan family,[1] closely assisted by Haleh Farshi, submitted simultaneous PPP loan applications for multiple entities on the same day, May 14, 2020, to Atlantic Union Bank ("AUB"). Bank personnel flagged the applications for review since it seemed implausible that so many people with the same family name, applying on the same day, had the high numbers of employees and payroll claimed for so many different business entities. Bank personnel were not wrong. The numbers were wildly false. AUB declined

---

[1] Foad Darakhshan, a/k/a David Darakhshan (hereafter "Foad"); Farough Darakhshan, a/k/a Frank Darakhshhan (hereafter "Farough"); and Fouzi Darakhshan, a/k/a Dave Darakhshan (hereafter "Fouzi").

1

loan applications for the Darakhshans. They, however, did not link two related individuals with different last names: Kianoosh Jafari and Marcus Gharib. Those individuals, assisted by Shoughi Darakhshan, also applied for, and obtained, PPP loans from AUB on May 14, 2020, using false information concerning payroll and numbers of employees.

Defendant Jafari obtained two PPP loans by fraud: (1) a $62,491.50 loan for his entity Kia Construction, LLC; and (2) a $62,491.50 loan for Tooth Fary LLC. PSR ¶¶ 21, 27. On the first loan, Jafari false represented that Kia Construction had three employees and an average monthly payroll of $24,999. Jafri also falsely represented that Kia Construction LLC had annual sales revenues of $750,000. PSR ¶ 22. At the time of application, Jafari well knew that Kia Construction had no annual sales revenues and no employees. PSR ¶ 23. Jafari was assisted in the fraud by Shoughi Darakhshan ("Shoughi"), his nephew. The second loan, for Tooth Fary, LLC (his wife's entity), was very similar. It was also submitted on May 14, 2020, and claimed the same incorrect average monthy payroll and false revenue numbers as had been provided for Kia Construction. PSR ¶ 28.

With the consent and approval of Jafari, Shoughi also caused to be submitted to AUB two sets (one set for each entity) of falsified IRS Forms 941, Employer's Quarterly Tax Return, for the last three quarters of 2019. In these forms, Jafari and Darakhshan falsely represented that Kia Construction LLC had three employees for each quarter and had paid these employees, in aggregate, between $75,148.21 and $81,692.69 in wages each quarter. PSR ¶ 24. In the fake tax forms for Tooth Fary, he falsely represented that that Tooth Fary LLC had three employees for each quarter and had paid these employees, in aggregate, between $93,202.50 and $95,989.12 in wages each quarter. PSR ¶ 29. Jafari signed his wife's name on a 'disbursement request and authorization' form with AUB for the approved loan amount, $62,497. PSR ¶ 30.

As a result of all these falsehoods, Jafari wrongfully obtained a total of approximately $164,982. *See* PSR ¶ 36. He spent those proceeds on personal expenses, such as vehicles, a riding lawnmower, repairs to the family swimming pool, cash withdrawals, and counter checks. PSR ¶¶ 26, 31.

The defendant's conduct at the time of the fraud was willful. He knowingly submitted falsified multiple IRS tax forms that were never actually filed with the IRS and submitted them to lenders. He grossly inflated revenue, payroll, and numbers of employees for entities that were either defunct or barely functioning.

The purpose of the paycheck protection program was to allow active companies adversely impacted by COVID-19 to continue to make payroll to documented employees. The defendants in this case uniformly had no W-2 employees. Records returned from the IRS show also that they issued few, if any, IRS Forms 1099 to independent contractors, in any recent years. The vast bulk of the funds obtained here could never have even been put toward payroll. It is clear that the defendant, a reasonably wealthy man, sought to obtain disaster relief funds by lying to the SBA and various financial institutions for his own financial gain. He did this at a time when many legitimate businesses desperately needed that money, businesses that actually paid real employees, that actually filed tax returns and paid employee withholding taxes and benefits.

## II.   GUIDELINES CALCULATION

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, it held that a sentencing court must "consult [the] Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); s*ee also United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United*

*States*, 552 U.S. 38, 49 (2007). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the [18 U.S.C.] § 3553(a) factors" in determining the appropriate sentence. *Id.* at 49–50; *see also Clark*, 434 F.3d at 685.

### A. The Base Offense Level and Loss Amount

The base offense is not in contention. As agreed in the plea agreement, the base offense level is 7. The actual loss amount was approximately $124,982 as to his two loans. As such, an 8-level enhancement for the loss amount is proper under U.S.S.G. § 2B1.1(b)(1)(E). The government joins the defendant's objection to applying a higher loss guideline based on the denied loans. Also, the defendant deserves the benefit of his plea agreement, and the government respectfully asks the Court to apply the actual loss amount in this specific case.

### B. Acceptance of Responsibility

The United States concurs with the Probation Officer's application of the two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a). If the defendant's offense level is ultimately determined to be higher than that calculated by the parties, then the government would certainly move for the additional one-point reduction under U.S.S.G. § 3E1.1(b).

### III. IMPOSITION OF SENTENCE

Pursuant to 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. Ultimately, the sentence imposed must

4

meet a standard of reasonableness. *See Booker*, 543 U.S. at 260–61. The advisory guidelines range is an important starting point because it captures the seriousness of the offense. *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes").

### A. The Nature, Circumstances, and Seriousness of the Offense

The COVID-19 pandemic has claimed over one million American lives, and many more world-wide. It disrupted life profoundly. We were fortunate to live in a country with resources to mitigate the worst of it. Among other actions to combat the pandemic, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, more commonly known as the "CARES Act." Pub. L. No. 116-136, 134 Stat. 281 (2020). The law sought to alleviate the massive suffering caused by the pandemic and the damage to the economy caused by resulting sudden, widespread lockdowns. The terms of the Act were generous by design: it made billions of government-guaranteed loans available to qualified small businesses through the Paycheck Protection Program ("PPP"). The loans would carry the exceptionally low interest rate of 1% if they came due at all. And the loans would be forgiven entirely so long as the proceeds were used on a narrow list of expenses designed to help struggling businesses survive: payroll, utilities, rent, premiums to keep health care benefits in force, and just enough to pay the interest (but not the principal) on a company's pre-existing mortgage or other business loan.

To qualify for a PPP loan, an applicant had to meet certain criteria that were designed to ensure that the program's assets would be used to forestall widespread layoffs and economic collapse. A business applying for a PPP loan was required to certify, among other things, that it was "in operation on February 15, 2020 and either had employees for whom [it] paid salaries and

payroll taxes or paid independent contractors, as reported on a Form 1099-MISC."[2] The amount of the loan that could be approved under the program was a function of the applicant's historical payroll costs, subject to certain exclusions. Again, the intent of the Act and its implementing regulations were to alleviate widespread economic suffering caused by the pandemic, by giving companies enough money to pay the absolute essentials.

While millions of Americans were struggling, the Darakhshan brothers, their friends and extended family, including their uncle, the defendant Kianoosh Jafari, plotted to obtain PPP loans by fraud. They resurrected dormant business entities in the days before applying for EIDL and PPP loans, entities that had no operations at all in 2019, let alone as of February 15, 2020. They made entirely from whole cloth backdated and preposterous IRS Forms 940 and 941, falsely claiming their businesses had paid payroll to fictious employees, even claiming they had withheld and paid over to the IRS substantial employee withholding taxes. None of that was true. None of it was a mistake or misunderstanding or undertaken in good faith.

These defendants, including Jafari, had no employees. They did not even issue IRS Forms 1099 to independent contractors in 2019 or 2020.  The defendant here engaged in fraud and deceit to obtain essentially free government money.

But this money has not been free to taxpayers, nor has it been cost-free to the country. No, the economy is now suffering from inflation the likes of which has not been seen since the 1970s. The willful actions of people like Jafari, who rushed in to take as much low-interest money as possible, by fraud, and then injected it into the economy without contributing much of anything productive in the process, certainly did not help matters.

The defendant freely chose to do these crimes. He had other options available. After all,

---

[2] PPP Borrower Application Form, Certifications, page 2, SBA Form 2483 (04/20).

banks offer other types of loans – like a construction loan, or a personal line of credit, an automobile loan, maybe even a riding lawn mower loan on a Home Depot card, but you have to tell the truth; you have to pass due diligence; maybe you have to pay a real interest rate and be expected to put up collateral and to pay it back. Jafari had all of those options and freely chose to engage in fraud.

This defendant was not without financial resources. He is, in fact, a millionaire. PSR ¶ 75. This was hardly a crime of necessity. It was entirely a crime of choice.

**B.    The Defendant's History and Characteristics and the Need for Specific Deterrence**

The history and characteristics of the defendant support a carceral sentence, but one that is not excessive. Jafari knew that what he was doing was fraudulent. And as a reasonably affluent individual, he had no need to do this crime. This kind of criminal conduct, willful and entirely a crime of choice and greed, counsels in favor of a carceral sentence of sufficient length to deter him from future misconduct.

**C.    Need to Deter Future Criminal Conduct and Promote Respect for the Law**

A significant, but not excessive sentence, is also called for in this case to promote general deterrence. Absent a meaningful term of imprisonment, general deterrence — "the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). The Court must also consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized.").

7

PPP loan frauds in general, and this crime in particular, are deliberate and calculated crimes of choice. They are therefore more susceptible to general deterrence and more in need of a significant sentence to achieve that deterrence. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted). Moreover, crimes like this are lucrative and can be difficult to detect. *See, e.g., United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.")

A carceral sentence is, therefore, necessary to send the appropriate message to these defendants—and more importantly, to others— that those who engage in this conduct will be caught and punished significantly. And this type of fraud appears to have been rampant: as much as $400 Billion in PPP funds and $80 Billion in EIDL funds were stolen by people like the defendant.[3]

### D.     Avoid Unwarranted Sentencing Disparities

A sentence that bears a close relationship to the guidelines is best calculated to avoid unwarranted sentencing disparities. As the Seventh Circuit has noted, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (noting

---

[3] "'Biggest Fraud in a Generation:' The looting of the Covid relief plan known as PPP," by Ken Dilanian and Laura Strickler, NBC News, March 28, 2022, available at https://www.nbcnews.com/politics/justice-department/biggest-fraud-generation-looting-covid-relief-program-known-ppp-n1279664 (last visited March 14, 2023) (quoting Department of Justice, Secret Service, and Small Business Administration estimates).

8

light sentence for cooperating defendant was appropriate and lengthy sentence for defendant who did not was appropriate, and was not a disparity, but a justifiable difference).

Related defendant Foad Darakhshan received a sentence of 33 months in this conspiracy, not far below the applicable guideline range that Judge O'Grady determined. *See* Dkt. No. 19, Case No. 1:21-cr-267. Defendant Frank Darakhshan received a sentence of 15 months, a variance below the low end of the court-determined guideline range (24 months). The sentences of Haleh Farshi (14 months) and Marcus Gharib (12 months and 1 day) were due, in part, to considerations contained in sealed filings. Shoughi received a sentence of 13 months, also in part due to a sealed filing. Jafari's sentence should be somewhere in the neighborhood of Shoughi and Gharib.

The government anticipates that the defendant will ask for a no jail sentence. Such an extreme downward variance is unwarranted. White collar defendants like Jafari should not get a total pass from jail, which is a consequence of serious felonious activity. *See, e.g., United States v. McHan*, 920 F.2d 244, 248 (4th Cir. 1990); *see also United States v. Peppel*, 707 F.3d 627, 640-41 (6th Cir. 2013) (reversing overly lenient sentence for prominent businessman); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (downward departure reversed for businessman who performed substantial community service and raised money for charity, on grounds that it was "neither exceptional nor out of the ordinary for someone of his income and preeminence"). *See also United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) (reversing light sentence because trial court gave undue weight to letters urging leniency). Any medical conditions the defendant has can be addressed by the Bureau of Prisons, or handled via a delay in reporting, but should not form the basis of an extreme downward variance.[4]

---

[4] The government's information on the defendant's health is based on what has been disclosed in the PSR and the representations of his counsel. The government has not seen any evidence of significant medical conditions that would require a significant sentencing variance.

Given all the factors discussed above, the government believes that a carceral sentence within the applicable guidelines range calculated by the parties is the just sentence to address all of the 3553(a) factors. This defendant, although he paid back the money after being charged, which is laudable, did not otherwise do anything of substantial assistance to merit a sentence below that of the other defendants in this case. And a substantial variance or probationary sentence in such a crime of choice, at a time of such public health crisis, would send the wrong message to the public and to the defendant.

### IV.  CONCLUSION

Based on the 18 U.S.C. § 3553(a) factors, a carceral sentence within parties' stipulated guideline range, and a term of supervised release, are necessary and appropriate in this case. Because the defendant paid full restitution, the government will not seek restitution or forfeiture orders.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____
Russell L. Carlberg
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3868
Facsimile: (703) 299-3980
Email: Russell.L.Carlberg@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2023, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

A copy has also been sent via email to:

Rachael Meyer
United States Probation Officer
Rachael_Meyer@vaep.uscourts.gov

/s/
Russell L. Carlberg
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3868
Facsimile: (703) 299-3980
Email: Russell.L.Carlberg@usdoj.gov